*489 OPINION OF THE COURT
Harold J. Hughes, J.
In this CPLR article 78 proceeding petitioner seeks a judgment: annulling the respondent’s denial of its application for enrollment as a Medicaid provider; directing the respondent to pay petitioner the deductibles and coinsurance for services to Medicare beneficiaries who are also Medicaid beneficiaries; determining that respondent’s denial of petitioner’s application for enrollment as a Medicaid provider is arbitrary, capricious, and contrary to the laws and regulations of New York State and of the Federal Social Security Act; directing the respondent to enroll the petitioner as a provider of services in the Medicaid program, and awarding it costs and disbursements, including attorneys’ fees.
Medicare was enacted during 1965 to provide medical insurance for people over 65 years of age and for certain disabled people. Part A of Medicare provides for payment of in-patient hospital care and related posthospital care. Enrollment in Part A is automatic. Part B of Medicare is a voluntary insurance program covering hospital out-patient services, physicians’ services, physical therapy, drugs, speech therapy, occupational therapy, psychotherapy, social work, and laboratory services. Persons seeking to enroll in Part B coverage are required to pay a monthly premium and an annual deductible. Once the deductible is exhausted, the Federal Government pays 80% of the "reasonable charges” for the services rendered. The Secretary of the United States Department of Health and Human Services sets the amount of that "reasonable charge”. The person receiving the services is responsible for paying the remaining 20% of the charge.
The Medicaid program was also enacted in 1965 to pay for medical care for poor people. States have the option of joining the Medicaid program, and New York State has chosen to participate. Having done so, it must comply with Federal statutes and regulations. Under its approved plan, New York has developed a methodology for establishing the fees that will be paid to providers of Medicaid patients. Medicaid rates are usually less than what has been established as the reasonable charge for the same services rendered to Medicare patients. New York’s Medicaid program is funded one-half by State funds, and one-half by Federal funds.
*490 One of the statutory purposes underlying the Medicare program is to provide medical care to the elderly and eligible disabled without regard to the recipient’s income. In other words, there is not to be a dual level of services, one for the financially secure and another for the poor. Congress was aware that some of the elderly and disabled did not have the financial means to elect Part B coverage because they could not afford the premiums, annual deductible, or the 20% copayment. Many people are eligible for both Medicare and Medicaid coverage, and this group is referred to as "dual eligibles”. Congress created another group called the "Qualified Medicare Beneficiaries” (QMBs), being persons eligible for Medicare and being below a certain level of poverty, but not eligible for Medicaid. Congress created a "buy-in” program pursuant to which the States could use Medicaid funds to pay the premiums to enroll "dual eligibles” and QMBs in Part B and pay the deductibles and copayments. This plan saves money for the States because once the "dual eligibles” and QMBs are covered by Medicare, the Federal Government pays 80% of their expenses, rather than the 50/50 arrangement that would otherwise apply under New York’s Medicaid program. New York State participates in the "buy-in” program. Under New York’s Medicaid plan, it will only make payments to an enrolled provider. The Commissioner of Social Services determines which applicants will be accepted as Medicaid providers.
Petitioner is a business corporation of which two of the three owners do not hold a professional license. It employs psychologists and social workers to provide mental health services. Petitioner was approved by the Federal Government as a Medicare provider on April 29, 1993. During June of 1993, petitioner applied to the Commissioner of Social Services to be enrolled as a Medicaid provider. On April 5, 1994, the Commissioner denied petitioner’s application for the following reason: "Two of the three owners of Senior Life Management are non-licensed entrepreneurs. Any entity offering professional services must be a sole proprietorship, partnership, professional service corporation, or must be specifically authorized by statute. All owners must be licensed to practice the profession involved. (See New York State Education Law and the Rules and Regulations governing the practice of the professions licensed by the Board of Regents pursuant to Title 8 of the New York Code of Rules and Regulations)”.
Petitioner requested administrative reconsideration, and *491 upon reconsideration the Commissioner rejected the application for the following reason:
"The committee found there was no mistake in fact. To practice a profession which is regulated by Title VIII of the Education Law, you must have a license, registration, or certificate (Section 65-22 [sic] of the Education Law).
"Department Regulation 18 NYCRR 504.1 (c) states a license, registration, or certificate is necessary to be eligible to furnish medical care, services, or supplies under the Medical Assistance Program, which this entity does not have. Denial upheld”.
The administrative denial resulted in this article 78 proceeding. The first cause of action in the petition alleges that as a certified Medicare provider the petitioner has rendered services to "dual eligibles” and QMBs and New York State has refused to pay for the services upon the ground that petitioner is not an enrolled Medicaid provider. It argues that this refusal to pay the deductibles and copayments for the "dual eligibles” and QMBs is in violation of Federal and State law and the "buy-in” agreement.
The second cause of action in the petition asserts that the respondent has misconstrued 18 NYCRR 504.1 (c) as requiring a license to render psychological or social work services. Petitioner argues that while other professions (such as medicine or nursing) cannot be practiced without a license, the same is not true in the areas of psychology and social work. Petitioner contends that any person or entity can engage in psychology or social work and that articles 153 and 154 of the Education Law governing those practices only require a license to use the titles of "psychologist” or "certified social worker”. Petitioner points out that all of the services rendered to its patients were provided by licensed psychologists and certified social workers employed by it. It is alleged that the respondent’s refusal to enroll the petitioner as a Medicaid provider is arbitrary and capricious.
The third cause of action asserts that there is nothing in the law prohibiting a business corporation from employing licensed social workers and psychologists, and the respondent’s refusal to enroll the petitioner in the Medicaid program is frustrating the petitioner’s corporate purpose.
Respondent’s defenses are: psychologists and certified social workers must hold licenses to provide services to Medicare or Medicaid patients, and since a license is required to render *492 the services for which petitioner seeks payment, 18 NYCRR 504.1 (c) was properly applied to deny the petitioner’s application; to the extent that the petitioner is receiving fees from psychologists and certified social workers it is engaged in the unauthorized use of the titles psychologist and certified social worker; and, to the extent that the petitioner is sharing in the fees generated by the providing of psychological and certified social services of its employees, it is engaging in illegal fee splitting in violation of 8 NYCRR 29.1 (b) (4). Petitioner counters that the fee-splitting rationale was not raised at the administrative level and therefore is not available here.
There are two powerful policies at work in this litigation. First is the Federal policy that Medicare providers approved by the Secretary of Health and Human Services are entitled to full payment of the reasonable charge for the services rendered to "dual eligibles” and QMBs from States that are participating in the "buy-in” program. Respondent relies upon the requirement in its Medicaid plan that Medicaid funds can only be paid to an enrolled provider. It is now settled law that "dual eligibles” and QMBs are primarily participants in the Medicare program, and Medicaid is to be viewed as only the source of funds to pay for that participation (Rehabilitation Assn. v Kozlowski, 42 F3d 1444 [4th Cir 1994]). That being so, requirements of a State’s Medicaid program that frustrate full payment under Medicare must yield (New York City Health & Hosps. Corp. v Perales, 954 F2d 854 [2d Cir 1992], cert denied — US —, 113 S Ct 461; see also, Pennsylvania Med. Socy. v Snider, 29 F3d 886 [3d Cir 1994]; Haynes Ambulance Serv. v State of Alabama, 36 F3d 1074 [11th Cir]). It is readily apparent under the above-cited decisions that the petitioner is entitled to receive full payment from the New York State Medicaid program for the reasonable value of the services it has rendered to "dual eligibles” and QMBs.
The only thing standing in the path is New York’s requirement that Medicaid funds can only be paid to authorized Medicaid providers. A similar issue was before the court in the Rehabilitation Assn. case (42 F3d 1444, supra). There, the petitioner was an association of rehabilitation agencies which provided health care services to "dual eligibles” and QMBs. Virginia enacted a Medicaid plan amendment limiting the amount that would be paid for Medicare services rendered to "dual eligibles” and QMBs to the price set for services rendered to pure Medicaid patients, and further directed that payments would not be made directly to physical therapy *493 providers for physical therapy services rendered to "dual eligibles” and QMBs residing in long-term care facilities, but rather that the payments would be made directly to the long-term care facilities. In striking down that payment plan, the Fourth Circuit Court of Appeals stated:
"Virginia makes a similar argument, and it highlights the problem more acutely: it states that 'Virginia recognizes no one as a Medicaid provider unless he has executed a written provider agreement with the Virginia Department of Medical Assistance Services.’ Br. of Appellant Kozlowski at 12. From this premise, Virginia argues that, since the Association’s members do not have provider agreements, they cannot receive funds directly. Applying this theory generally suggests that any health service provider of whatever type who provides Medicare Part B services to QMBs will not be eligible for reimbursement of the 20% copayment from Virginia unless she also has executed a written Medicaid provider agreement with the state. Thus, under this approach, a provider who does not participate in both the Medicare and Medicaid programs, or who for whatever reason has not signed a written agreement with the State, cannot receive reimbursement of the Medicare Part B copayment because she is not a Medicaid eligible service provider. Simply speaking, this approach makes no sense, and converts a simple 20% copayment into a bureaucratic nightmare. Thus, while neither the Secretary’s nor Virginia’s argument causes many concerns when simply approached on the particular facts of the case, a full understanding of the inadequacy of each when viewed from a more general perspective undermines their analytic soundness. It seems largely irrelevant that the nursing facility is required to provide these services under Medicaid; the fact of the particular arrangement under Medicaid should not be of import in deciding whom to reimburse for Medicare procedures.
"We are left to determine how Virginia appropriately complies with the requirement of 42 U.S.C. § 1396a(a)(32) that it not pay 'for any care or service provided to an individual * * * to anyone other than such individual or the person or institution providing such care or service.’ Although Medicaid funds are in question, they are being used to pay the Medicare Part B copayment for services provided under the Medicare Act. As such, the proper approach looks not to the Medicaid statute but rather to the Medicare statute to determine who is the appropriate entity for payment. After the 1989 amend *494 ments, payment under Medicare Part B for 'physicians’ services’ for all QMBs may only be made on an assignment-related basis. 42 U.S.C. § 1395w-4(g)(3)(A). Physicians’ services are defined to include the type of rehabilitation services involved here. Id. § 1395w-4(j). They are considered 'outpatient physical therapy services’ under 42 USC § 1395x(p), which are services 'furnished by a provider of services, a clinic, rehabilitation agency, or a public health agency.’ As rehabilitation agencies, the plaintiff’s members fall within this definition and receive payment directly from Medicare carriers. They are the direct billers and should be the direct payees. This reasoning harmonizes the Medicaid requirement that payment only be made to the individual or service provider by finding that, as to Medicare reimbursement, it is the Medicare statute that governs whether the rehabilitation agency should be considered a service provider. Under that statute, the rehabilitation providers are the 'providers’ of services, not the long term nursing facilities in which the patients reside.” (42 F3d, at 1461-1462.)
The same approach will be followed here. The Secretary of Health and Human Services recognizes the petitioner as the Medicare provider of the services being received by the "dual eligibles” and QMBs. To the extent that New York law prohibits payment of Medicaid funds directly to the authorized Medicare provider of services for "dual eligibles” and QMBs, it must be struck down. The appropriate procedural vehicle to accomplish that result is not an article 78 proceeding, but an action pursuant to 42 USC § 1983 (Rehabilitation Assn. v Kozlowski, supra; New York City Health & Hosps. Corp. v Perales, supra). The New York Supreme Court has the jurisdiction to entertain claims under 42 USC § 1983 (Matter of Campain v Marlboro Cent. School Dist. Bd. of Educ., 138 AD2d 914), and the court will exercise its discretion under CPLR 103 (c) to convert the first cause of action in the petition to a claim under 42 USC § 1983. The plaintiff will be awarded a judgment upon that cause of action directing the respondent to pay the petitioner for past services rendered to "dual eligibles” and QMBs, and in the future to make the 20% copayments directly to the petitioner. An award of attorneys’ fees under 42 USC § 1988 is not appropriate because there are special circumstances which would render such an award unjust. In particular, the Medicaid and Medicare acts and implementing regulations have been described by courts on numerous occasions as among the most complex and confusing *495 ever created. The interplay between the two programs with regard to "dual eligibles” and QMBs has only recently been sorted out by various Federal courts of appeals. The Commissioner has been operating under a legal mandate to disburse Medicaid funds to approved Medicaid providers only. His position in rejecting petitioner’s claims was not only reasonable, but required of him.
The second policy present in this case is New York’s policy of limiting Medicaid payments to providers duly licensed to render the required services. Through the second cause of action it appears that the petitioner is not only interested in being paid for the services rendered to "dual eligibles” and QMBs, but also seeks to become a Medicaid provider able to treat all Medicaid patients and be reimbursed for those services. The respondent objects, contending that entrepreneurs should not be permitted to split the fees earned by the licensed professionals rendering the services. 42 USC § 1396a (a) (32) provides in pertinent part that a State Medicaid plan must:
"(32) provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise; except that—
"(A) in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made (i) to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clinic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service”.
In Michael Reese Physicians & Surgeons v Quern (606 F2d 732, 736 [7th Cir 1979], on reh 625 F2d 764, cert denied 449 US 1079), that statute was interpreted as follows: "Congress clearly anticipated that Medicaid services would frequently be provided by clinics operating as corporations. It does not follow that a state may not elect to pay physicians as individuals for the services they perform, rather than making pay *496 ments to the legal entity under which they practice. Indeed, prior to the institution of the present policy, IDPA has always made payment in the name of the physician, rather than to the Michael Reese Corporation. Section 1396a(a)(32) recognizes that in the normal circumstance payments should be made to the individual performing the service. That section goes on to create an exception for employee-physicians. For the reasons stated above, we hold that the exception acts to relieve the state Medicaid program from the requirement of paying the individual physician; it does not require the program to make payment to the employer upon the request of the physician.”
From the outset, New York State has provided the most generous Medicaid benefits in the country. On the other hand, it has sought to control Medicaid costs through various devices, including prohibiting fee splitting (Deutsch v Health Ins. Plan of Greater N. Y., 573 F Supp 1443 [SD NY 1983]). Another attempt to implement that policy is 18 NYCRR 504.1, wherein the Commissioner states that the Department will only contract for Medicaid services with those persons able to demonstrate that they are qualified to provide the medical care, services or supplies required, and that if a license is required to render the service the applicant must hold such a license to be a Medicaid provider. The Commissioner interprets that regulation to require that a person or entity seeking to be an authorized provider of psychological or social work services must hold a valid license. The court need not cite case law for the proposition that the Commissioner’s interpretation of his own regulation will be upheld if not irrational. While petitioner’s position that anybody can practice psychology or social work and only those persons seeking to use such titles need acquire a license may be correct, that does not require that any person or entity practicing psychology or social work without a license must be accepted as a Medicaid provider. To require that only licensed psychologists and social workers be accepted as Medicaid providers gives a level of protection to Medicaid patients while also attempting to control costs. The two nonlicensed owners of the corporate petitioner have not argued that they themselves are qualified to provide the services needed by the Medicaid patients. The *497 Commissioner’s interpretation of his regulation as requiring that only licensed psychologists or social workers be accepted as Medicaid providers is rational, and the second and third causes of action in the petition will be dismissed for lack of merit.